2021 IL App (1st) 200485-U
No. 1-20-0485
Order filed April 12, 2021

First Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

---

| | |
|---|---|
| RETIREMENT PLAN FOR CHICAGO TRANSIT AUTHORITY EMPLOYEES, | ) Appeal from the<br>) Circuit Court of<br>) Cook County. |
| Plaintiff-Appellant, | ) |
| v. | ) No. 17 CH 08090<br>) |
| DORVAL CARTER, DENNIS ANOSIKE, JOYCE COLEMAN, and LYNN SAPYTA, | ) Honorable<br>) David B. Atkins, |
| Defendants-Appellees. | ) Judge, presiding. |

---

JUSTICE HYMAN delivered the judgment of the court.
Justice Pierce and Justice Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Order granting summary judgment to defendants on plaintiff's breach of fiduciary duties claim affirmed where plaintiffs failed to present evidence showing defendants withheld information that was material or that plaintiff incurred damages from the non-disclosure.

¶ 2    For the second time, we resolve a dispute over prescription drug rebates involving the Retirement Plan for Chicago Transit Authority Employees (RP), a pension fund. *Retirement Plan For Chicago Transit Authority Employees v. The Chicago Transit Authority*, 2020 IL (1st) 182510.

¶ 3      While that case proceeded, RP sued current and former Chicago Transit Authority executives appointed by the CTA to RP's Retirement Allowance Committee (RAC). RP contends defendants breached their fiduciary duties by failing to disclose rebates to other RAC members. RP claims defendant's breach resulted in nearly $7 million in damages, the amount in rebates the CTA received between 2003 and 2009. Also, RP contends it lost the opportunity to enter its own contract for rebates with a prescription drug provider.

¶ 4      The parties filed cross motions for summary judgment. The trial court granted defendants' motion for summary judgment and denied RP's motion, which sought summary judgment only on liability. The trial court found defendants' knowledge of the rebates was not material because RP failed to present evidence entitling it to the rebates and, thus, could not recover monetary damages. Nor had RP shown that had defendants disclosed the rebates sooner, RP would have done anything differently.

¶ 5      RP contends the trial court erred in (i) finding defendants' knowledge that the CTA retained prescription drug rebates was not material to RP, and (ii) granting summary judgment to defendants as to damages. We affirm. RP failed to present evidence entitling it to the rebates. Hence, defendants' knowledge of the rebates was not material to RP, and it suffered no monetary damages by the non-disclosure. Moreover, RP failed to present evidence that it would have pursued its own prescription drug contract, as the record shows RP continued paying the CTA's invoices for two years after learning about the rebates.

¶ 6                                    Background

¶ 7      We addressed RP's dispute with the CTA over prescription drug rebates in *Retirement Plan For Chicago Transit Authority Employees v. The Chicago Transit Authority*, 2020 IL (1st) 182510.

We explained the prescription drug program and rebates in detail there and repeat those facts relevant to the issues here.

¶ 8    The CTA provided prescription drugs to its employees and retirees through its pharmacy benefits provider, Caremark. Under its contract with Caremark, the CTA received rebates based on several factors, including the price, volume, and method of dispensing prescription drugs. Between 2003 and 2009, RP paid the CTA about $89.5 million for prescription drugs for retirees, with RAC's approval. And Caremark paid the CTA about $7.3 million in rebates attributable to retirees' prescription drug purchases. (In 2009, the Illinois legislature replaced the RAC with the Retirement Healthcare Trust, which took responsibility for providing health care benefits to retirees and their beneficiaries).

¶ 9                                      CTA Lawsuit

¶ 10    RP sued the CTA in 2013, alleging that the CTA's retention of the rebates breached the CTA's agreement to charge RP the "actual cost" of prescription drugs purchased. RP further alleged, in part, that the CTA breached its fiduciary duties and violated provisions of the Illinois Pension Code by retaining the prescription drug rebates generated from retiree drug purchases. The CTA counterclaimed, asserting that the rebates partially offset the administrative costs it incurred in handling healthcare claims for retirees and their dependents, and sought to recover under theories of unjust enrichment and *quantum meruit*.

¶ 11    The trial court dismissed RP's breach of contract and unjust enrichment claims as barred by the statute of limitations. Specifically, the trial court found that "[b]ecause Kallianis and members of the RAC had knowledge as to the rebates and the Retirement Plan's payment of invoices, under principals of agency law this information is imputed onto the Retirement Plan."

Despite knowing the rebates were not credited toward its remittances, RP continued paying the invoices for two years. The trial court applied the discovery rule, finding the five-year statute of limitations barred RP's breach of contract claim.

¶ 12    After a bench trial on the remaining claims, the trial court entered judgment against RP on the complaint and against the CTA on its counterclaims. Based on the testimony of several CTA employees, the trial court found that the rebates constituted a CTA asset used to offset the administrative costs in managing the prescription drug program. And that Kallianis's "unilateral expectation" that the rebates should go to RP as a discount on the actual cost of drugs was "not compelling evidence *** that Rebates were ever a Plan asset."

¶ 13    We affirmed the summary judgment order on RP's breach of contract and unjust enrichment claims and the trial court's judgment in the CTA's favor. *Retirement Plan For Chicago Transit Authority Employees v. The Chicago Transit Authority*, 2020 IL (1st) 182510. Relevant here, the court held that "the statute of limitations [on RP's contractual claims] commenced on February 8, 2007, when Kallianis learned that RP was not receiving rebates." *Id*. ¶ 47.

¶ 14                    Lawsuit Against RAC Members

¶ 15    In June 2017, while the earlier lawsuit proceeded, RP filed a complaint against defendants, Doval Carter, Dennis Anosike, Joyce Coleman, and Lynn Saptya, alleging they breached their fiduciary duties by: (i) putting the interests of the CTA ahead of RP's interests, (ii) putting their interests as CTA employees ahead of RP's interests, and (iii) failing to disclose material facts to RP, namely, the existence of the prescription drug rebates and the CTA's failure to credit those rebates to RP on its invoices of the actual cost. RP alleged defendants' failure to disclose the rebates resulted in the CTA overbilling RP by nearly $7 million. In a deposition, Richard Burke,

RP's corporate representative, identified additional damages incurred from the non-disclosures: (i) actual monies RP paid the CTA for prescription drugs that should have drawn the rebates; (ii) legal expenses RP incurred in pursuing recovery of the rebates; and (iii) amount of investment income RP would have received but for paying for pursuing the lawsuits.

¶ 16    In depositions, defendants acknowledged knowing about the CTA's retention of the Caremark rebates. Still they asserted the information was not material to RP because the rebates did not reduce the prescription drugs' actual costs. Instead, the rebates offset the costs of administering the healthcare plans.

¶ 17    The parties filed cross-motions for summary judgment. RP moved for summary judgment on the issue of liability; defendants moved for summary judgment on liability as well as damages. Defendants asserted that RP's failure to establish in the earlier case or this case its entitlement to the rebates shows that its knowledge was not material. According to defendants, the rebates were a "general contracting incentive to the CTA, not a direct discount on the price of drugs." Thus, absent evidence that RP was entitled to the rebates, RP could not show defendants' non-disclosures were material to RP or that RP sustained damages.

¶ 18    Conversely, RP argued that the CTA admitted the rebates were material in the earlier case, and the trial court confirmed the materiality when it cited defendants' knowledge in granting summary judgment on the breach of contract claims on statute of limitations grounds. RP further argued that whether it was entitled to the rebates was "wholly irrelevant" because a possibility that RP "may have been contractually entitled to" the rebates demonstrates that the rebates were material. In other words, even if RP had no contractual entitlement to the rebates, the information

was nonetheless material—RP may have opted to pursue another course of action, including purchasing healthcare, thereby directly receiving the prescription drug rebates.

¶ 19    The trial court granted defendants' motion for summary judgment and denied RP's motion for partial summary judgment. As to each parties' claims that the earlier case's findings were dispositive of materiality, the trial court found neither party was "entirely correct." The court said that "relevance of knowledge to the running of a statute of limitations does not equate to materiality of that knowledge to the operation of the Plan's business. Similarly, [RP's] failure to show that the rebates were ever a Plan asset or that it was directly entitled to them does not *per se* prove their existence immaterial, as argued by Defendants."

¶ 20    But the court found "the lack of evidence to that effect instructive" in light of RP's failure to produce evidence of materiality through discovery. Moreover, because RP's alleged damages are the rebates and related expenses, the court could not find defendants' knowledge of the rebates to be material "when the alleged damage from concealing that fact is a loss of the rebates themselves—despite the Plan already having failed to show any entitlement to the same." The court added that this raises a "distinct basis" for judgment for defendants because RP "cannot show damages for any breach of fiduciary duty based solely on a loss of monies it was not entitled to in the first place."

¶ 21    The court found RP's alternative arguments for materiality speculative. It reasoned that had RP known about the rebates, it "might have pursued some alternative contract with some party other than the CTA that could have been more beneficial. Plaintiff offers no evidence to this effect, and it is accordingly insufficient to withstand summary judgment." Indeed, the court found that to the extent evidence exists, it works against RP, which "knew of the rebates at least as of 2007, and

that despite that knowledge it in fact took no action to seek any third-party agreement. Plaintiff offers no reason to believe that it would have done anything different had it learned of the rebates in 2003 rather than 2007."

¶ 22                                  Analysis

¶ 23                             Standard of Review

¶ 24    We review a trial court's grant of summary judgment *de novo*. *Argonaut Midwest Insurance Co. v. Morales*, 2014 IL App (1st) 130745, ¶ 14. For summary judgment, the movant must show (i) no triable issue of material fact exists and (ii) entitlement to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018). Genuine issues of material fact involve disputed material facts or, if undisputed, that reasonable persons might draw different inferences from those facts. *Id.* Where the parties have filed cross-motions for summary judgment, as here on the issue of liability, they agree no genuine issue of material fact exists and invite the court to decide the issue as a question of law based on the record. *Pielet v. Pielet,* 2012 IL 112064, ¶ 28. This court may affirm a trial court's grant of summary judgment on any basis appearing in the record, regardless of the trial court's reasoning. *Harlin v. Sears Roebuck & Co.*, 369 Ill. App. 3d 27, 31-32 (2006).

¶ 25                               Materiality

¶ 26    Where parties have a fiduciary or confidential relationship, the defendant is under a duty to disclose all material facts. *Connick v. Suzuki Motor Co. Ltd.*, 174 Ill. 2d 482, 500 (1996). See also Restatement (3d) of Agency § 8.11 (agent must disclose "the facts [that] are material to the agent's duties to the principal"). For a withheld fact to be material, once aware of the withheld fact, RP has to show that it would have acted differently. *Cwikla v. Sheir*, 345 Ill. App. 3d 23, 33 (2003).

¶ 27    RP contends that its entitlement to the rebates presents an open question and the "mere existence" of rebates it *may* have been entitled to demonstrate materiality and triggers defendants' fiduciary duties to inform RP.

¶ 28    Defendants acknowledge that as members of the RAC, they owed fiduciary duties to RP, which included the duty to disclose all material facts within the scope of their fiduciary relationship. But information about the rebates was not material to RP because the rebates offset the cost of administrating the program and not the prescription drugs' cost. Before us and in the trial court, defendants rely mainly on the evidence presented and the trial court's findings in the earlier case. Specifically, the testimony of (i) Larry Wall, former CTA benefits manager, that the rebates were a CTA asset, as part of the contract the CTA negotiated with Caremark to lower the cost of administering the health care program; (ii) defendant Dennis Anosike, the CTA's former chief financial officer, that the rebates constituted an industry norm and, in his experience, do not get passed on to pension funds; and (iii) defendant Lynn Sapyta, the CTA's former comptroller, that the rebates' amount was based on multiple factors and not directly correlated to the number of prescription drugs purchased. After considering this testimony and other evidence, including the testimony of RP's executive director, Kallianis, the trial court concluded that Kallianis's "unilateral expectation [that the Caremark rebates should be credited to RP] is not compelling evidence of a fiduciary relationship, nor does it show that the rebates were ever a Plan asset."

¶ 29    RP argues that the factual question—whether they were entitled to the rebates—was never litigated and should not have been considered by the trial court. According to RP, the trial court in the earlier case dismissed RP's breach of contract claim on statute of limitations grounds and only addressed breach of fiduciary duty and statutory claims. We disagree. The trial judge said the

findings in the earlier case were not dispositive as to materiality. The trial judge found the "lack of evidence" there "instructive," particularly in light of [RP's] failure to produce any other support for materiality through discovery in this case."

¶ 30     Our review of the record confirms that finding. Nothing in the record disputes the CTA's contention that it negotiated the rebates to defray administrative costs, and RP proffered no evidence that it was entitled to the rebates. Indeed, defendants reiterated in their depositions in this case that the rebates did not reduce the actual costs of prescription drugs but rather offset the costs of administering healthcare plans for both active and retired employees. RP's failure to present evidence refuting that contention, along with the holding in the earlier case, supports the trial court's summary judgment order.

¶ 31     RP asserts, however, that had it known about the rebates, it may have pursued other options for a prescription drug plan, and that other RAC members may have refused to approve the CTA drug invoices. RP argues that in addressing whether this was material, the trial court erred in applying a subjective standard (what RP did after finding out about the rebates in 2007) rather than an objective standard (what a reasonably prudent member of the RAC would have done with information about the rebates). Again, we disagree.

¶ 32     We note that the standard set forth in *Cwikla* regarding materiality is what the party *would* have done with the withheld material fact, not what the party *may* have done with the information. *Cwikla*, 345 Ill. App. 3d at 33. RP adduced no evidence indicating that had it known about the Caremark rebates, it would have acted differently. Indeed, all the evidence points to the contrary. As RP's executive director Kallianis acknowledged, he knew about the CTA's receipt and retention of the Caremark rebates at the latest in February 2007. Yet, for the next two years, until

the newly created Retirement Healthcare Trust took over CTA retirees' healthcare in February 2009, RP continued paying CTA's healthcare invoices in full.

¶ 33    Nonetheless, RP cites four sources of "undisputed evidence" showing that defendants' knowledge of the CTA's retention of prescription drug rebates was material. We will address each in turn.

¶ 34    First, RP argues that the rebates were material because members of the RAC had a duty to refuse prescription drug invoices that exceeded the "actual cost" of the drugs. RP contends that a reasonably prudent RAC member would have wanted to know about the rebates to ascertain (i) whether some portion of the rebates should have been credited to RP and (ii) whether RP could have obtained healthcare benefits through a third-party administrator to capture the rebates for RP.

¶ 35    This argument merely restates that RP *may* have been entitled to the rebates and *may* have done something different had it known about them. As noted, RP failed to present any evidence of entitlement or refuting the CTA's contention that the rebates offset the administrative costs. Nor has RP presented evidence showing it would have done anything differently, as once it learned about the rebates, it continued to pay the invoices.

¶ 36    Second, RP argues that in granting the CTA's motion for summary judgment on statute of limitations grounds, the trial court in the earlier case deemed defendants' knowledge of the rebates material, imputing knowledge to RP. But, RP misstates the facts. Although the trial court noted that defendants knew about the rebates, it was the knowledge of its executive director, John Kallianis, that was imputed to RP. This court agreed and affirmed "the trial court's finding that the statute of limitations commenced on February 8, 2007, when Kallianis learned that RP was not

receiving rebates." *Retirement Plan for Chicago Transit Authority Employees*, 2020 IL App (1st) 182510, ¶ 47.

¶ 37    Third, RP contends that defendant Anosike acknowledged the rebates were material when he agreed that "any appropriate payment the Plan is obligated to make is material to the Plan." And because the CTA used the Caremark rebates to offset the costs of administering its healthcare program, these rebates "became an obligation of the [RP]," and "material." This contention is inaccurate. No one disputes that the CTA never invoiced RP for a share of administrative costs. Although the CTA did file a counterclaim for administrative costs in the earlier case, it did so due to RP having sought a share of the rebates. The trial court ruled against the CTA on its counterclaim, and the CTA did not appeal that ruling. Accordingly, the CTA's administrative costs were not "an obligation of the [RP]."

¶ 38    Finally, RP asserts that the RAC frequently discussed prescription drug expenses, as well as the underfunded nature of the Plan, and that defendants' knowledge of prescription drug rebates was germane to these discussions, rendering that information material to defendants' fiduciary duties. What RP ignores is that for information about the Caremark rebates to be "germane" to these discussions, the rebates would have had to reduce RP's healthcare costs. As noted, the Caremark rebates did not reduce RP's healthcare costs; they belonged to the CTA, not RP. So, information about the rebates was not germane to the RAC's discussions of RP's healthcare expenses.

¶ 39    Moreover, RP presents no evidence showing that once it learned about the rebates, at least by February 2007, it showed interest or took steps toward procuring its own prescription drug contract. RP continued to pay the invoices without incident for the next two years. Even accepting

RP's argument—it took no steps toward obtaining healthcare contracts after 2007 because the Illinois legislature took that decision away from RP in 2008 when it established the Retirement Healthcare Trust—the record shows that once RP learned about the rebates, it never considered entering its own prescription drug contract.

¶ 40    Summary judgment " 'is the put up or shut up moment in a lawsuit.' " *North Community Bank v. 17011 South Park Avenue, LLC*, 2015 IL App (1st) 133672, ¶ 15, (quoting *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 14. To "put up," the party opposing summary judgment ordinarily must produce actual evidentiary facts that would enable a trier of fact to return a favorable outcome and not "mere speculation, conjecture, or guess." *Barrett v. FA Group, LLC*, 2017 IL App (1st) 170168, ¶ 26 (quoting *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999)).

¶ 41    RP speculates it *may* be entitled to the rebates and it *may* have acted differently had it known about the rebates. In the absence of concrete facts, defendants' knowledge was neither material nor had to be disclosed.

¶ 42                                    Damages

¶ 43    RP contends the trial court erred in granting summary judgment to the CTA on the issue of damages.

¶ 44    As a preliminary matter, we address RP's contention that the trial court should not have decided the damages issue as a matter of law. RP argues that it filed a cross motion for summary judgment as to liability only, not damages. But, defendants' motion for summary judgment specifically argued that they are "entitled to summary judgment because [RP] cannot establish that Defendants' alleged breach of their fiduciary duties proximately caused damages to the [RP]." So,

defendants placed the issue before the trial court, which was not limited to addressing just the issues raised in RP's motion. If RP wanted to defeat the CTA's motion for summary judgment as to damages, it should have presented some evidence to support it. *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 12 (to defeat motion for summary judgment, party does not need to prove their case but must present some evidence to support each element of their case).

¶ 45    Further, RP contends the trial court "conflated the elements of materiality and damages." Incorrect. The trial court stated that RP's lack of damages "raises a distinct basis for judgment: not only does the mere existence/amount of the rebates fail to satisfy Plaintiff's burden of showing materiality thereof, it cannot show damages for any breach of fiduciary [duty] based solely on a loss of monies it was not entitled to in the first place." Regardless, we "may affirm the trial court's ruling for any reasons supported by the record regardless of the basis relied upon by the trial court." *Abramson v. Marderosian*, 2018 IL App (1st) 180081, ¶ 40.

¶ 46    Turning to the merits, RP argues that in addition to the monetary damages, it (i) lost its ability to pursue a timely breach-of-contract action against the CTA to recover its portion of the rebates, and (ii) could have secured its own prescription drug contract and received the rebates itself had it known of the rebates sooner. RP asserts the trial court erred in stating it was "undisputed" that RP knew about the rebates as of 2007, because the minutes from an open meeting of the Board of Trustees in February 2009 supports a finding that other than defendants, no other member of the RAC learned about the Caremark rebates in February 2007. RP further asserts that defendant Saptya by remaining silent after the issue was raised, actively concealed information about the rebates during the Board of Trustees' meetings in February and October 2009.

¶ 47    In the earlier case, we found that RP learned about the CTA's receipt and retention of the Caremark rebates in February 2007. *Retirement Plan for Chicago Transit Authority Employees*, 2020 IL App (1st) 182510, ¶¶ 42, 45. We stated, "RP concedes it knew about the rebates as of February 8, 2007, when Kallianis inquired about them in an e-mail to Wall." *Id.*, ¶ 42. Kallianis was RP's executive director. His knowledge is imputed to RP. *McRaith v. BDO Seidman, LLP* 391 Ill. App.3d 565, 589 (2009). When other members of the RAC knew about the rebates is irrelevant.

¶ 48    Next, as noted, nothing in the record supports RP's contention that, had it known about the Caremark rebates, it may have secured its own contract. As the trial court pointed out, to the extent that evidence exists as to this theory, "it works against [RP]: it is undisputed that it knew of the rebates at least as of 2007, and that despite that knowledge, it in fact took no action to seek any third-party agreement." Moreover, "mere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Lee v. Six Flags Theme Parks, Inc.*, 2014 IL App (1st) 130771, ¶ 61. Without evidence, RP's assertion amounts to speculation and fails to establish it suffered damages due to defendants' non-disclosures.

¶ 49    Affirmed.